**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| SHERRY L. PENNINGTON, | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. H-08-3616 |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY, | § | |
| Defendant. | § | |

**MEMORANDUM AND RECOMMENDATION ON**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This matter was referred by United States District Judge Lee H. Rosenthal, for full pre-trial management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket Entry #3). Cross-motions for summary judgment have been filed by Plaintiff Sherry Pennington ("Plaintiff," "Pennington") and by Defendant Michael J. Astrue ("Defendant," "Commissioner"), in his capacity as Commissioner of the Social Security Administration ("SSA"). (Plaintiff's Brief in Support of Motion for Summary Judgment ["Plaintiff's Motion"], Docket Entry #22; Defendant's Cross-Motion for Summary Judgment ["Defendant's Motion"], Docket Entry #18). Each party has filed a response to the competing motions. (Plaintiff's Reply Brief in Response to Defendant's Memorandum in Support of Cross-Motion for Summary Judgment ["Plaintiff's Response"], Docket Entry #26; Defendant's Response to Plaintiff's Cross-Motion for Summary Judgment ["Defendant's Response"], Docket Entry #25). After considering the pleadings, the administrative transcript, and the applicable law, it is RECOMMENDED that Plaintiff's motion be GRANTED, and that Defendant's motion be DENIED. It is also RECOMMENDED that this case be remanded to the SSA for further development on the issue of Plaintiff's physical and mental impairments, as set out in this memorandum.

## Background

On March 5, 2003, Plaintiff Sherry L. Pennington filed an application for Social Security Disability Insurance Benefits ("DIB"), under Title II of the Social Security Act ("the Act"). (Transcript ["Tr."] at 169-71).  In her application, Pennington claimed that she had been unable to work since November 20, 2002,[1] as a result of "fibromyalgia"[2] and "chronic fatigue immune dysfunction syndrome."[3]  (Tr. at 177).  She also stated that her symptoms included "chronic leg pain which limits how far [and] long [she] can walk or stand, severe headaches, allergies, fatigue, concentration problems, [and] insomnia."  (*Id.*).  On June 11, 2003, Pennington informed the SSA that she did not suffer from any mental or emotional problems.  (Tr. at 201-04).  The SSA denied her application on June 30, 2003, finding that Pennington is not disabled under the Act.  (Tr. at 129, 135).  On July 19, 2003, Plaintiff petitioned for a reconsideration of that decision.  (Tr. at 137).  The SSA had her case independently reviewed, but again denied her benefits, on September 3, 2003.  (Tr. at 130, 139-42).

On October 23, 2003, Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Tr. at 143).  That hearing, before ALJ Lantz McClain, took place on January 11,

---

[1] Subsequent documents, including the opinion of the administrative law judge, cite November 17, 2002, as the alleged onset date of Pennington's disability.  (*See, e.g.*, Tr. at 24, 186).

[2] "Fibromyalgia" is "a form of nonarticular rheumatism characterized by musculoskeletal pain, spasm and stiffness, fatigue, and severe sleep disturbance."  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 632 (5th ed. 1998).  "Common sites of pain or stiffness can be palpated in the lower back, neck, shoulder region, arms, hands, knees, hips, thighs, legs, and feet.  Physical therapy, nonsteroidal antiinflammatory drugs, and muscle relaxants provide temporary relief."  *Id.*

[3] "Chronic fatigue [and] immune dysfunction syndrome," also called "chronic fatigue syndrome," is "a condition characterized by disabling fatigue, accompanied by a constellation of symptoms, including muscle pain, multijoint pain without swelling, painful cervical or axillary adenopathy, sore throat, headache, impaired memory or concentration, unrefreshing sleep, and postexertional malaise."  *Id.* at 336.  The term "adenopathy" refers to "an enlargement of any gland."  *Id.* at 38.

2

2005.  (Tr. at 45-74).  Plaintiff appeared with her attorney, Marc Whitehead ("Whitehead"), and she testified on her own behalf.  (Tr. at 45, 49-62).  The ALJ also heard testimony from Pennington's mother, Sarah Buerger ("Buerger"); from Dr. John Anigbogu ("Dr. Anigbogu"), a rehabilitation specialist; and from Emma Vasquez, a vocational expert.  (Tr. at 62-73).  During the hearing, in addition to statements about Plaintiff's physical condition, the witnesses also testified regarding Pennington's state of mind, including an apparent "history of depression." (*See* Tr. at 62-70).  On June 23, 2005, the ALJ issued a decision to deny her benefits.  (Tr. at 111-25).  On July 20, 2005, Pennington filed a request for the Appeals Council to review the ALJ's decision.  (Tr. at 126-27).  SSA regulations provide that the Appeals Council will grant a request for a review if any of the following circumstances is present:

> (1) there is an apparent abuse of discretion by the ALJ; (2) an error of law has been made; (3) the ALJ's action, findings, or conclusions are not supported by substantial evidence; or (4) there is a broad policy issue which may affect the public interest.

20 C.F.R. §§ 404.970 and 416.1470.  The Appeals Council granted the request and, on March 28, 2006, it vacated the ALJ's decision and remanded the case for further consideration of Pennington's physical and mental condition.  (Tr. at 32-35).  In its decision, the Council detailed deficiencies in the ALJ's decision, and it instructed the ALJ to address certain matters on remand.  (*Id*.).  The Appeals Council's first explicit instruction was that the ALJ was to further develop the record on Pennington's depression.  (Tr. at 34).  The Council stated that, if warranted, additional evidence could include psychological testing, a consulting psychological examination, and an evaluation of Pennington's mental residual functional capacity.  (*Id*.).  The second instruction was that the ALJ give further consideration to the opinions from Pennington's treating sources.  (*Id*.).  Another instruction, if warranted, was for the ALJ to obtain the opinion

of a vocational expert based on the expanded record.  (*Id*.).  And the final instructions were for the ALJ to "offer the claimant an opportunity for a hearing, take any further action needed to complete the administrative record[,] and issue a new decision."  (Tr. at 35).

After the case was remanded, the ALJ obtained additional evidence from Pennington's treating sources, and arranged for her to have a psychological examination by a psychologist. (Tr. at 27, 505-22; Plaintiff's Motion at 7-8).  On May 1, 2007, a second hearing took place before Administrative Law Judge Gary Suttles ("ALJ Suttles").  (Tr. at 75-108).  Plaintiff again appeared with her attorney, Marc Whitehead, and she testified on her own behalf.  (Tr. at 75, 78-98).  The ALJ also heard testimony from Charles Poor ("Poor"), a vocational expert.  (Tr. at 98-107).  Pennington and Poor were the only witnesses presented at the second hearing.  Following the hearing, the ALJ engaged in the following five-step, sequential analysis to determine whether Plaintiff was capable of performing substantial gainful activity or was, in fact, disabled:

1.   An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings.  20 C.F.R. §§ 404.1520(b) and 416.920(b).

2.   An individual who does not have a "severe impairment" will not be found to be disabled.  20 C.F.R. §§ 404.1520(c) and 416.920(c).

3.   An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will not be considered disabled without consideration of vocational factors.  20 C.F.R. §§ 404.1520(d) and 416.920(d).

4.   If an individual is capable of performing the work she has done in the past, a finding of "not disabled" must be made.  20 C.F.R. §§ 404.1520(e) and 416.920(e).

5.   If an individual's impairment precludes performance of her past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

4

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).  It is well settled that, under this analysis, the claimant bears the burden to prove any disability that is relevant to the first four steps.  *See Wren*, 925 F.2d at 125.  If she is successful, the burden then shifts to the Commissioner, at step five, to show that she is able to perform other work that exists in the national economy.  *See Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Wren*, 925 F.2d at 125.  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability.  *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).  An individual claiming disability insurance benefits under the Act has the burden to prove that she suffers from a disability.  *See Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985).  Under the Act, a claimant is deemed disabled only if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months."  *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing 42 U.S.C. § 423(d)(1)(A)).  "Substantial gainful activity" is defined as "work activity involving significant physical or mental abilities for pay or profit."  *Newton*, 209 F.3d at 452.  A physical or mental impairment is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  *Hames v. Heckler*, 707 F.2d 162, 165

5

(5th Cir. 1983) (citing 42 U.S.C. § 423(d)(3)).  Further, the impairment must be so severe as to limit the claimant so that "she is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any kind of substantial gainful work which exists in the national economy."  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citing 42 U.S.C. § 423(d)(2)(A)).

Based on these principles, as well as his review of the evidence of record, the ALJ determined that Pennington suffers from "fibromyalgia," "chronic fatigue syndrome," and "affective mood disorder (depression),"[4] and that those impairments are "severe."  (Tr. at 26). He found, however, that she "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments."  (Tr. at 27).  Next, the ALJ determined that Pennington is unable to perform her past relevant work as a "pharmacy technician."  (Tr. at 30).  However, he found that she has the residual functional capacity ("RFC") to perform a restricted variety of sedentary work, as follows:

> [T]he claimant has the residual functional capacity to lift and/or carry 10 pounds occasionally and 5 pounds frequently.  She requires a sit/stand option and can walk four hours in an eight hour day.  The claimant is limited from climbing stairs, ladders, ropes, [or] scaffolds, [and from] running.  Her push/pull and gross/fine ability is unlimited.  She gets along with others, understands simple instructions, concentrates and perform[s] simple tasks, and responds and adapts to workplace changes and supervision with limited contact with coworkers and the public.

(Tr. at 28, 31).  The ALJ also found that there are a significant number of jobs in the national economy that Pennington is capable of performing, including work as a "bench assembler," "optical goods worker," and "surveillance monitor."  (Tr. at 31).  With these findings, he

---

[4]  The phrase "affective mood disorder" refers to "a variety of conditions characterized by a disturbance in mood as the main feature."  *Id*. at 47, 1049.  "Depression" is defined as "an abnormal emotional state characterized by exaggerated feelings of sadness, melancholy, dejection, worthlessness, emptiness, and hopelessness that are inappropriate and out of proportion to reality."  *Id*. at 467.

concluded that Pennington "has not been under a disability, as defined in the Social Security Act, from November 17, 2002 through the date of this decision," and he denied her application for disability insurance benefits.  (*Id.*).

On June 22, 2007, Plaintiff requested an Appeals Council review of ALJ Suttles's decision. (Tr. at 12).  On September 19, 2008, the Council denied her request for review, finding that no applicable reason for review existed.  (Tr. at 4-8).  With that ruling, the ALJ's findings became final.  *See* 20 C.F.R. §§ 404.984(b)(2) and 416.1484(b)(2).  On November 14, 2008, Pennington filed this suit, pursuant to section 205(g) of the Act (codified as amended at 42 U.S.C. § 405(g)), to challenge the decision.  (Complaint, Docket Entry #1).  Subsequently, the parties filed cross-motions for summary judgment.  After considering the pleadings, the administrative transcript, and the applicable law, the court recommends that Plaintiff's motion be granted, that Defendant's motion be denied, and that this case be remanded, for further development, on the issue of Plaintiff's physical and mental impairments.

**Standard of Review**

Federal courts review the Commissioner's denial of disability benefits only to ascertain whether the final decision is supported by substantial evidence and whether the proper legal standards were applied.  *See Newton*, 209 F.3d at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)).  "If the Commissioner's findings are supported by substantial evidence, they must be affirmed."  *Id*. (citing *Martinez*, 64 F.3d at 173).  "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion.  It is more than a mere scintilla and less than a preponderance."  *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see Martinez*, 64 F.3d at 173 (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990)).  On review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to

determine whether it contains substantial evidence to support the Commissioner's decision." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *see Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987).  In making this determination, the court must weigh the following four factors: the objective medical facts; the diagnoses and opinions from treating physicians on subsidiary questions of fact; Plaintiff's own testimony about her condition; and Plaintiff's educational background, work history, and present age.  *See Wren*, 925 F.2d at 126.  If no credible evidentiary choices or medical findings exist that support the Commissioner's decision, then a finding of no substantial evidence is proper.  *See Johnson*, 864 F.2d at 343.

**Discussion**

Before this court, Plaintiff challenges the ALJ's findings on three grounds.  First, she argues that the ALJ erred because he failed to find that she lacks the residual functional capacity to perform any gainful employment.  (Plaintiff's Motion at 4-10).  Within this claim, she contends that the ALJ did not give proper deference to the opinions of her treating sources.  (*Id.*).  Next, Plaintiff claims that the ALJ erred because he found that she was not entirely credible.  (*Id.* at 10-12).  Finally, Plaintiff claims that "[t]he ALJ erred in finding that a significant number of jobs existed in the national economy that [she] could perform."  (*Id.* at 12-13).  Defendant insists, however, that the ALJ properly considered all of the available evidence, and followed the applicable law, in determining that Plaintiff is not disabled.  (Defendant's Response at 1-5).

### *Medical Facts, Opinions, and Diagnoses*

The earliest medical records show that Pennington was treated at Kingwood Medical Center, on a regular basis, beginning in January of 2000.  (Tr. at 218-316, 394-504).  The first of these records, dated January 11, 2000, documents Pennington's visit for treatment of allergy symptoms, such as swelling in the face and eyes, due to an unknown cause.  (Tr. 314-16).  Dr.

8

Thong Do ("Dr. Do"), an internist, noted that Pennington reported suffering from allergies for at least three years, "off [and] on."  (Tr. at 314).  Dr. Do assessed her condition as urticaria.[5]  (*Id*.). He prescribed Zyrtec, an allergy medication, and referred Pennington to an allergist for an expert assessment.  (*Id*.).  Pennington saw an allergist, Dr. Kris Bhat ("Dr. Bhat"), on January 28, 2000. (Tr. at 311-13).  Dr. Bhat noted that Pennington had been suffering from "hives for [the] last 3 months with some itching."  (Tr. at 311).  He also wrote that she reported that "her lips swells [sic] up" approximately twice a week, and that swelling is accompanied by itching.  (*Id*.).  At the appointment, however, no skin rash was present.  (Tr. at 312).  Dr. Bhat found Pennington to be "alert and responsive," to be "well nourished and active," and not in "acute respiratory distress." (*Id*.).  The doctor stated that he was unable to perform an allergy skin test because of a medication that Pennington had recently taken, but that his impression was that she suffered from chronic urticaria.  (*Id*.).  He prescribed a medicine regimen to combat the allergies.  (*Id*.). Pennington was seen again by Dr. Do, or his physician's assistant, in April and May, 2000, complaining of fatigue, pain in her back and her left kidney area, and nausea.  (Tr. at 297, 303-05).  She was treated with medication.  (*See id*.).  On July 6, 2000, Pennington was examined by Dr. Do for complaints of leg and back pain that radiated to her legs, and for sinus problems and a sore throat.  (Tr. at 297).  Dr. Do ordered an x-ray of her lumbar spine, which revealed a "[d]isc space reduction at L5-S1 and to a milder degree at L4-5."  (Tr. at 294-96).  Pennington was treated with pain and allergy medication.  (Tr. at 297).  On July 20, 2000, Pennington had a follow-up appointment with Dr. Do.  (Tr. at 293).  Pennington reported that her back pain had not improved, and that it "fe[lt] like a knot."  (*Id*.).  In addition, she told the doctor that she was

---

[5] "Uticaria," which is "[a]lso called hives," is "a puritic skin eruption characterized by transient wheals of varying shapes and sizes with well-defined erythematous margins and pale centers."  *Id*. at 1684.

doing exercises at home to help deal with the pain, but that she had stopped taking one of her prescribed pain medications because it had given her indigestion.  (*Id*.).  Dr. Do prescribed a different pain medication.  (*Id*.).

On August 20, 2000, Pennington went to the emergency room at Kingwood Medical Center, complaining of back pain.  (Tr. at 469).  She stated that she had injured her back when she bent and "heard a loud pop."  (*Id*.).  She described her pain as "sharp" and "acute," and reported that it was more severe than her usual back pain.  (*Id*.).  She also stated that movement exacerbated her pain, and that remaining still relieved it.  (*Id*.).  The triage nurse noted that Pennington appeared to be in moderate distress.  (Tr. at 470).  She also observed that Pennington had vertebral point tenderness, and decreased range of motion in her back.  (*Id*.).  Pennington was given a straight leg raising test,[6] which revealed pain at 30 degrees.  (*Id*.).  Pennington was admitted to the hospital with a preliminary diagnosis of acute low back pain and acute herniated disc at L5.  (*Id*.).  An MRI of her lumbar spine revealed "some narrowing of the L5-S1 disc space," but an "otherwise, negative lumbar spine."  (Tr. at 489).  On August 22 and 23, 2000, Pennington received physical therapy.[7]  (Tr. at 494-95).  Those records show that she encountered difficulty in therapy, because she was in a lot of pain, and because some of the exercises led to muscle spasms.  (*Id*.).  On August 23, 2000, however, Pennington was showing improvement, and the following was noted on her record:  "The pain was controlled and [she was] ambulating well.  Her neuro exam was intact in the lower extremities."  (Tr. at 476).  On

---

[6] A "straight leg raising test" is "a physical examination technique to determine abnormality of the sciatic nerve or tightness of the hamstrings."  *Id*. at 1546.  "The presence of sciatica is confirmed by sciatic nerve pain radiating down the limb when the supine person attempts to raise the straightened limb."  *Id*.

[7] Shortly before she was hospitalized, Dr. Do had ordered Pennington to begin professional physical therapy.  (Tr. at 290-92).  A treatment plan was drawn up for her, and it was noted that Pennington's "[o]verall rehabilitation potential [was] good."  (Tr. at 288, 290-91).

that same date, Pennington was discharged, with a final diagnosis of "acute herniated disc." (Tr. at 472, 480, 493).

In September, 2000, Pennington reported to Dr. Do that she still suffered from back pain, and that it radiated down her legs. (Tr. at 287). On October 29, 2000, Pennington had an appointment with Dr. Richard Spinnato ("Dr. Spinnato"), a gynecologist. (Tr. at 440). She complained of back pain, pubic pressure, and a feeling of "things falling out." (*Id.*). Dr. Spinnato examined Pennington, and diagnosed her as suffering from "moderate uterine prolapse"[8] and a condyloma.[9] (Tr. at 440, 441). Dr. Spinnato scheduled her to undergo a "[t]otal vaginal hysterectomy and carbon dioxide laser vaporization of condyloma." (*Id.*). On October 31, 2000, Pennington was admitted into the Kingwood Medical Center hospital for the surgery. (Tr. at 439, 441). Dr. Spinnato, who performed the operation, reported that it was successful and that there were no complications. (Tr. at 441-43). A subsequent biopsy of the removed organ and tissue revealed no malignancy. (Tr. at 444-45). During her hospital stay, Pennington was given medication for pain, nausea, and "itching." (Tr. at 461-66). Pennington was discharged on November 1, 2000. (Tr. at 461).

The next medical records show that Pennington returned to Dr. Do on March 30, 2001, because her "[h]usband recently died," and she "want[ed] something to help her sleep [at] night." (Tr. at 285). Dr. Do prescribed Xanax, an anti-anxiety medication. (*Id.*). On May 9, 2001, the doctor changed the prescription to Paxil, an anti-anxiety and anti-depressant medication. (Tr. at 284). On May 17, 2001, he changed the prescription again, to the anti-depressant Wellbutrin, after Pennington complained of "very bad side effects" from Paxil,

---

[8]  The term "uterine prolapse" refers to "the falling, sinking, or sliding of the uterus from its normal location in the body." MOSBY'S at 1686.

[9]  A "condyloma" is "a wartlike growth on the anus [or] vulva, . . . usually sexually transmitted." *Id.* at 382.

including the feeling of being "drugged [and] sleepy all the time."  (*Id*.).  During this period, Pennington was still being treated for lower back pain, which she described as "shooting" pain, and for pain in her sacrum and upper gluteus.  (*Id*.).  The medical records show that Pennington continued to complain of pain in her back and legs, and also reported pain in her hips and knees.  (Tr. at 271-80).  In addition, she complained of cramping, muscle spasms, and swelling in her legs, as well as abdominal discomfort and indigestion.  (*Id*.).  She further complained of depression, and reported that the Wellbutrin was "not helping."  (Tr. at 279).  Dr. Do ordered an x-ray of her left hip, but it revealed "no fracture, dislocation or significant degenerative change."  (Tr. at 275).  Dr. Do also ordered a blood test, which revealed that she had a very low level of antibodies.  (Tr. at 274).  Dr. Do prescribed antibiotic medication for that condition.  (Tr. at 272-74).

In September, 2001, Dr. Do ordered a sleep study.  (Tr. at 267).  The results of the study revealed that Pennington had a "[g]rossly normal sleep architecture with minimal sleep disordered breathing."  (Tr. at 265).  It was suggested that Pennington's sleep problems would improve if she adjusted her "sleep behaviors to include a regular sleep/wake cycle and adequate total sleep time."  (*Id*.).  The report also stated that Pennington's difficulties with functioning during the day was most likely a side effect of her medication, rather than a result of "minimal sleep disordered breathing."  (*Id*.).

On September 12, 2001, Pennington was seen by Dr. Do, because of complaints of pain in her legs and her hips, and muscle spasms, although she also reported that it hurt her to walk.  (Tr. at 268).  This time, Dr. Do assessed her as suffering from fibromyalgia, and he prescribed pain medication.  (*Id*.).  On October 18, 2001, Dr. Do noted that Pennington reported no improvement in her symptoms, and that she was considering taking a leave of absence from

work until her condition improved. (Tr. at 262). Dr. Do then referred Plaintiff to a rheumatologist. (*Id.*). On November 1, 2001, Pennington had an initial evaluation by a rheumatologist, Dr. Enrique Vasquez ("Dr. Vasquez"). (Tr. at 250-59). Dr. Vasquez found Pennington to be in no acute distress, and his multi-level examination revealed that her symptoms were largely within normal limits. (Tr. at 250). He did note, however, that she had some tenderness in her spine and her abdomen, and that she appeared to be depressed. (Tr. at 250-51). Dr. Vasquez assessed Pennington as suffering from "probable fibromyalgia" with general aches, poor sleep, stomach discomfort, and chronic depression. (Tr. at 252). He stated that her prognosis was "good." (Tr. at 253). Dr. Vasquez examined Pennington again, on January 10, 2002, and diagnosed her as suffering from "fibromyalgia with [increased] activity." (Tr. at 248). He prescribed pain medication for the fibromyalgia symptoms. (Tr. at 249). On March 27, 2002, Dr. Vasquez reported an increase in Pennington's points of tenderness, her lack of energy, her muscle aches, and her headaches. (Tr. at 240). He also noted that Pennington was complaining of shoulder pain, and he diagnosed her as suffering from right shoulder bursitis. (Tr. at 240-41).

On April 18, 2002, Pennington reported to Dr. Do that she had been suffering from dizziness, nausea, and diarrhea for the past two to three days, and she stated that she had been unable to take her medication as a result of those symptoms. (Tr. at 239). Pennington also reported that the symptoms had begun after she spent part of the day at the "races," where she got sunburned on her arms and legs. (*Id.*). Dr. Do diagnosed her as suffering from dehydration. (*Id.*). Pennington was admitted to the hospital, where she was treated for dehydration with IV fluids and medication. (Tr. at 408). While hospitalized, Pennington was evaluated by Dr. Ranga Nathan ("Dr. Nathan"), a gastroenterologist, who diagnosed her as suffering from dehydration,

13

acute gastroenteritis, nausea, and gastroesophageal reflux disease ("GERD").[10]  (Tr. at 409-10,

414).  Pennington was discharged from the hospital on April 21, 2002.  (Tr. at 408).  On June 11,

2002, Pennington was seen again by Dr. Nathan, who diagnosed her as suffering from a hiatal

hernia[11] and from gastroesophageal problems.   (Tr. at 236).   She prescribed Nexium, an

anti-heartburn medication.  (*Id.*).

   Pennington saw Dr. Vasquez again in July, 2002, and he changed her medications due to

complaints that her current regimen was ineffective.  (Tr. at 234).   Subsequently, Pennington

complained about the new medications, and Dr. Vasquez continued to try to find an effective

medicine.   (Tr. at 229-33).   In December, 2002, Pennington returned to the Kingwood

emergency room, complaining of increased pain in her right shoulder due to a fall "when a

4-wheeler rolled over her."  (Tr. at 226, 405).   An x-ray was taken, which revealed a "mildly

displaced, comminuted fracture" in her neck, but "no evidence of dislocation."  (Tr. at 226, 396).

Pennington's arm was put in a sling.  (Tr. at 405).  On December 30, 2002, Pennington had a

follow-up appointment with Dr. Ken Korthauer ("Dr. Korthauer"), an orthopedic surgeon.  (*Id.*).

Dr. Korthauer recommended that Pennington undergo surgery, and Pennington consented.  (*Id.*).

On January 3, 2003, Pennington was admitted to the Kingwood Medical Center for a surgical

procedure described as an "open reduction and internal fixation of the right shoulder."  (Tr. at

394-96).   Dr. Korthauer performed the surgery, and he released her the following day with a

prescription for pain medication and the observation that she appeared to be in "good" condition.

(Tr. at 395, 493).  The last record from the Kingwood Medical Center, dated March 14, 2003,

shows that Pennington was treated for sinusitis and for migraine headaches.  (Tr. at 222).

---

[10]  "Gastroesophageal reflux disease" is a condition involving "a backflow of contents of the stomach into the
esophagus that is often the result of incompetence of the lower esophageal sphincter."  *Id.* at 677.

[11]  A "hiatal hernia" is a "protrusion of a portion of the stomach upward through the diaphragm."  *Id.* at 761.

The next medical records document Pennington's treatment by Dr. Patricia Salvato ("Dr. Salvato"), an internist, beginning in September, 2002.  (Tr. at 333-89).  The record of their first appointment, dated September 24, 2002, shows that Pennington presented with a chief complaint of "fibromyalgia-widespread pain."  (Tr. at 363).  Pennington also complained of total body pain, pain in her hips and legs, fatigue, respiratory problems, frequent headaches, pain in her shoulders, knees, and ankles, and depression.  (*Id*.).  Dr. Salvato noted that Pennington had been diagnosed as suffering from fibromyalgia within the past year.  (*Id*.).  She also listed the following as part of Pennington's medical history:  a hiatal hernia, gastroesophageal reflux disease, insomnia, and depression.  (*Id*.).  Dr. Salvato performed a physical examination, and found Pennington to have a positive affect and to be oriented as to person, place, and time.  (Tr. at 371).  She reported that Pennington had muscle and joint pain and "tender points."  (Tr. at 367-68).  She indicated that Pennington was currently suffering from fatigue and a headache. (Tr. at 369).  Finally, based on the exam and Pennington's reported history, Dr. Salvato listed the following as her "impressions":  fibromyalgia, fatigue, pain, insomnia, a memory disturbance, depression, and a history of gastroesophageal reflux disease and a hiatal hernia.  (Tr. at 371).  On November 11, 2002, Pennington had a follow-up examination.  (Tr. at 355).  At that appointment, Pennington complained of increased levels of leg and body pain, headaches, insomnia, and depression.  (*Id*.).  She also rated her level of fatigue as "eight" on a ten-point scale.  (*Id*.).  Dr. Salvato diagnosed Plaintiff as suffering from fibromyalgia, pain, fatigue, insomnia, a memory disturbance, depression, and gastroesophageal reflux disease.  (Tr. at 357). On January 27, 2003, Dr. Salvato saw Pennington, and on that day, her chief complaints were pain and fatigue.  (Tr. at 349).  Dr. Salvato noted, however, that Pennington described her level of leg pain and her trouble with insomnia as "improved."  (Tr. at 349).  Dr. Salvato again

15

diagnosed her as suffering from fibromyalgia, pain, fatigue, insomnia, memory problems, gastroesophageal reflux disease, and depression. (Tr. at 351). In addition, the doctor ordered a blood test. (Tr. at 353-54). The results showed that Pennington's natural killer cell[12] level was at the low end of the normal range. (*Id*.). On March 24, 2003, Pennington went to Dr. Salvato, complaining about fatigue and pain, as well as increased headaches, nausea, and sinus congestion. (Tr. at 345). Dr. Salvato diagnosed her as suffering from pain, fibromyalgia, fatigue, insomnia, memory disturbance, gastroesophageal disease, and depression. (Tr. at 347). On July 2, 2003, Dr. Salvato performed a physical examination after Pennington came to her, complaining of fatigue, and of pain that she described as "unbearable." (Tr. at 341). Dr. Salvato diagnosed her as suffering from chronic pain, fibromyalgia, fatigue, insomnia, memory problems, gastroesophageal reflux, and depression. (Tr. at 343). She prescribed Methadone for pain, and recommended a follow-up examination in three months. (*Id*.). However, three weeks later, Plaintiff returned to Dr. Salvato and complained chiefly about fatigue, rating it a "nine" on a scale of one to ten, with ten being the worst. (Tr. at 337). She told the doctor that she believed that she was experiencing side effects from the Methadone, including nervousness, nausea, sleepiness, and increased levels of depression. (Tr. at 337, 340). She further complained of persistent leg pain and "sinus/allerg[y]" problems. (Tr. at 337). Dr. Salvato diagnosed her as suffering from chronic pain, fatigue, insomnia, memory problems, gastroesophageal reflux, and depression. (Tr. at 339). She decided to discontinue the Methadone, and gave Plaintiff a prescription for hydrocodone. (*Id*.). Further records from Dr. Salvato contain similar findings and the same diagnoses as from previous visits. The records show further that the doctor

---

[12] A "natural killer cell" is "a lymphocyte that is capable of binding to and killing virus-infected and some tumor cells by releasing cytotoxins." *Id.* at 1085.

continued to try different medications to alleviate Plaintiff's symptoms.  (Tr. at 386-89 [February 5, 2004], 383-85 [May 18, 2004], 379-82 [August 17, 2004], 374-78 [November 16, 2004]).  At least one of these records, dated August 17, 2004, indicates that one medication was successful in relieving some of her pain, as Pennington rated her pain that day as a "five," for "bearable," on a ten-point scale.  (Tr. at 379).

On October 9, 2005, at a standard physical exam, Pennington complained to Dr. Salvato about increased pain, fatigue, nausea, headaches, and other symptoms.  (Tr. at 333).  Dr. Salvato noted that Pennington had experienced a recent weight loss of twenty-one pounds.  (*Id*.).  She diagnosed Pennington again as suffering from fibromyalgia, chronic pain, fatigue, insomnia, gastroesophageal reflux disease, depression, and a memory disturbance.  (Tr. at 335).

On June 16, 2003, Dr. Moises Lopez ("Dr. Lopez"), an internist, performed a physical examination of Pennington on behalf of the state.  (Tr. at 317-22).  In addition to examining Plaintiff, he ordered an x-ray of her left hip, which revealed "[n]o significant osseous, articular, or soft tissue abnormalities."  (Tr. at 320).  Dr. Lopez listed Pennington's chief complaints as "chronic fatigue," fibromyalgia, and an "immune disorder."  (Tr. at 317).  He reported that his "general impression" of Pennington was of a "well developed, well nourished female in no distress," who "appears somewhat depressed."  (Tr. at 318).  He examined Plaintiff's respiratory system, found her to have a "clear" nose and throat, and observed that her lungs were "[c]lear to percussion and auscultation."  (*Id*.).  His examination of her heart revealed a normal sinus rhythm, but a "soft" cardiac murmur.[13]  (*Id*.).  Dr. Lopez then examined Pennington's back, and found "no tenderness or limitation o[f] motion."  (*Id*.).  He also found no limitation of motion,

---

[13] A "cardiac murmur," also referred to as a "heart murmur," is "an abnormal sound heard during auscultatory examination of the heart, caused by altered blood flow into a chamber or through a valve."  *Id*. at 269.

17

and no muscle atrophy, in Pennington's extremities.  (Tr. at 319).  Dr. Lopez reported that

Pennington's gait was "within normal limits including tandem toe and heel gait," and that she

"was able to move around without any difficulty."  (Tr. at 319, 321-22).  He noted, as well, that

she had "fine and dexterous finger control."  (*Id*.).  In addition, he stated that he had observed

"no skin eruptions."  (Tr. at 319).  Dr. Lopez also conducted a neurological examination, which

he found to be "entirely normal."  (*Id*.).  He elaborated that Pennington had "no motor or sensory

dysfunction," and that her "deep tendon reflexes were 4+ throughout and symmetrical."  (*Id*.).

He also observed that her "[s]traight leg raising [was] 90 degrees bilaterally seated and supine."

(*Id*.).  Dr. Lopez's clinical impression was that Pennington suffered from "[p]ossible chronic

fatigue syndrome."  (*Id*.).  He wrote the following, under the heading "work-related functions":

> The patient is able to sit and stand for short periods, walk for short distances, lift
> light weights, handle objects with fine finger control.  Her hearing is adequate for
> normal conversation.  Her speaking is easily understood and her vision is 20/20 in
> both eyes corrected.

(*Id*.).

A record, dated June 30, 2003, shows that Pennington was again evaluated by a state

physician, Dr. Bonnie Blacklock ("Dr. Blacklock"), a general practitioner.  (Tr. at 324-31).  Dr.

Blacklock completed a physical residual functional capacity evaluation, on which she reported

"possible fatigue syndrome" as a primary diagnosis.  (*Id*.).  She found that Pennington could lift

or carry 20 pounds occasionally, and 10 pounds frequently.  (Tr. at 325).  She also found that

Pennington could sit, stand, or walk for 6 hours in an 8-hour workday.  (*Id*.).  Further, she found

that Pennington's ability to push and pull was unlimited, except for the "lift and/or carry"

restrictions.  (*Id*.).  In her report, Dr. Blacklock also indicated that she found Pennington to have

no "postural limitations," "manipulative limitations," "visual limitations," "communicative

18

limitations," or "environmental limitations."  (Tr. at 326-28).  Ultimately, Dr. Blacklock found

Pennington's allegations to be "partially credible," based on the evidence in the record.  (Tr. at

329, 331).

The next medical record, dated April 14, 2005, is a "Fibromyalgia Residual Functional

Capacity Questionnaire" that was completed by Dr. Salvato, on Pennington's behalf.  (Tr. at

506-12).   At the beginning of the evaluation, Dr. Salvato stated that she had been seeing

Pennington on a "fairly regular basis" since September 24, 2002, to treat fibromyalgia.  (Tr. at

506).  Dr. Salvato explained the fibromyalgia diagnosis, as follows:

> Patient has the classic tender points on physical exam, at least 11 out of 18, above
> and below the waist, on the right and left side of the body, consistent with the
> American College of Rheumatology's definition of Fibromyalgia.

(*Id*.).  Dr. Salvato also diagnosed Pennington as suffering from chronic fatigue syndrome.  (*Id*.).

Dr. Salvato rated Pennington's prognosis as "guarded."   (*Id*.).   She added that she does not

believe that Pennington is a "malingerer," and reported that Plaintiff's physical and mental

impairments are "reasonably consistent with the symptoms and functional limitations described

in this evaluation."  (Tr. at 507-08).   Dr. Salvato identified Plaintiff's symptoms as the

following:  "multiple tender points"; "nonrestorative sleep"; "chronic fatigue"; "chronic fatigue

syndrome"; "morning stiffness"; "muscle weakness"; "frequent, severe headaches"; and

"depression."  (Tr. at 507).  She added that emotional factors contribute to Plaintiff's symptoms

and her functional limitations.  (*Id*.).   Dr. Salvato also reported that Pennington suffers from

bilateral pain in her lumbosacral spine, as well as in her shoulders, arms, hands, fingers, legs,

and "knees/ankles/feet."  (Tr. at 508).  She stated that Pennington's pain is precipitated by such

factors as changes in the weather, fatigue, movement, and stress.  (*Id*.).   She also stated that

19

Pennington is incapable of tolerating even low levels of workplace stress.  (Tr. at 509).  She reported that Pennington described her pain in the following manner:

> a constant, widespread pain which is never completely resolved, even with pain medication, and which is exacerbated by stress and over-movement.

(Tr. at 508).  Dr. Salvato added that Pennington's medications have negative side effects, such as "drowsiness" and "upset stomach."   (Tr. at 509).   She also reported that Pennington's impairments are likely to produce "good days" and "bad days."  (Tr. at 512).

In her RFC evaluation, Dr. Salvato reported that, in a typical workday, Pennington's pain and other symptoms would "frequently" to "constantly" interfere with the attention and concentration needed to complete even simple task.  (Tr. at 508).  Dr. Salvato estimated that, on average, Pennington would have to miss more than four days of work each month because of her symptoms or to undergo treatment.  (Tr. at 511).  She explained that "[i]t is the intensity, duration and frequency of symptoms preventing [Pennington] from returning to gainful employment."  (*Id*.).  Dr. Salvato stated that Pennington was capable of walking less than one block "without rest or severe pain."  (Tr. at 509).  She also stated that Pennington could sit, stand, or walk less than two hours in an eight-hour workday.  (*Id*.).  In fact, she stated that Pennington would "need a job which permits shifting positions at will from sitting, standing or walking."  (Tr. at 510).  Dr. Salvato reported that Pennington would need to take unscheduled breaks after every hour of activity, during which she would have to lie down for two hours before resuming activity.  (*Id*.).  With regard to workplace activities, Dr. Salvato stated that Pennington could "rarely" twist, stoop, bend, crouch, or climb stairs, and that she could "never" climb ladders.  (Tr. at 512).  She stated that Pennington has "significant limitations in doing repetitive reaching, handling or fingering."  (*Id*.).  She stated, as

well, that Pennington could only "occasionally" lift or carry less than ten pounds, "rarely" lift or carry ten or twenty pounds, and "never" lift or carry fifty pounds.  (Tr. at 510).

The most recent medical records, from March, 2007, document the findings by Dr. Mark Lehman ("Dr. Lehman"), a psychologist, who completed a state consultative evaluation of Pennington's mental capacity.  (Tr. at 513-22).  His examination took place on March 3, 2007, and Dr. Lehman reported that Plaintiff was "clean and well groomed."  (Tr. at 513).  Dr. Lehman observed that Plaintiff needed her husband's assistance to stand from a seated position, and that her "gait appeared slow and stiff," but that she was able to ambulate without assistive devices. (*Id.*).  He also noted that she "appeared to be in pain towards the end of the lengthy assessment." (Tr. at 513-14).  Dr. Lehman further observed that Pennington had a flat affect, and that "her mood was depressed."  (Tr. at 516).  Dr. Lehman reported Pennington's chief complaint to be an inability to work because of fibromyalgia and depression.  (Tr. at 514).  Dr. Lehman commented on Pennington's level of functioning on a routine basis, as follows:

> Ms. Pennington's ability to complete routine tasks varies dramatically depending on whether she's having a "good day" or "bad day."  On "bad days," she does not get out of bed except to use the restroom and eat.  On a "good day," she performs simple, routine chores including laundry, washing dishes and simple cooking. She stated that she shops and leaves the house "only when [she has] to."  She tries to interact with her grandchildren, providing that lifting is not involved.  On a "good day," she is able to bathe and dress herself without assistance.

(Tr. at 515).  Dr. Lehman also gave Pennington the IQ[14] test known as the Wechsler Adult Intelligence Scale-III ("WAIS-III"),[15] which revealed her to be "likely functioning within the

---

[14] An "IQ," or "intelligence quotient," is defined as "a numeric expression of a person's intellectual level as measured against the statistical average of his or her age group."  *Id*. at 847.

[15] The Wechsler Intelligence Scales are "a series of standardized tests used to evaluate cognitive abilities and intellectual abilities in children and adults."  THE FREE DICTIONARY, *http://medical-dictionary.thefreedictionary.com*. After the appropriate test is given, "Verbal and Performance IQs are scored based on the results of the testing, and then a composite Full Scale IQ score is computed."  *Id*.

Low Average classification of intelligence."[16] (Tr. at 516).  Additionally, Dr. Lehman conducted

the Wide Range Achievement Test-4th Edition,[17] which revealed that Pennington's skills in

reading, spelling, and arithmetic were at or above a twelfth-grade level.  (*Id*.). Dr. Lehman also

performed a neuropsychological screening, using the Wechsler Memory Scale-3rd Edition, and

reported the following results:

> Ms. Pennington's performance on Trails A was completed accurately yet was in
> the impaired range (-3S.D.) due to slow speed (45 seconds).  Similarly, Trails B
> was accurate yet three standard deviations below the mean for speed (115
> seconds).

(Tr. at 517).   At the conclusion of his examination, Dr. Lehman diagnosed Pennington as

suffering from "depression due to medical condition, under partial medical control," and from

psychosocial stressors, including "chronic pain," "crowded living conditions," and "financial

concerns."   (*Id*.).   He gave her a rating of "48" on the Global Assessment of Functioning

("GAF") scale.[18] And he gave Pennington the following prognosis:

> Ms. Pennington's mild cognitive deficits are felt to be secondary to inactivity,
> depression and, possibly, medication side effects.  Her mild cognitive deficits
> would likely resolve spontaneously given an improvement in her situation.  Her
> depression may respond to additional treatment.

(*Id*.).

On March 9, 2007, Dr. Lehman completed his assessment of Pennington's mental

residual functional capacity.  (Tr. at 520-21).  He reported that Pennington was "slightly" limited

in her ability to "understand and remember short, simple instructions," to "carry out short,

---

[16] Pennington achieved a verbal score of 85, a performance score of 91, and a full scale IQ score of 87.  (Tr. at 516).

[17] The Wide Range Achievement Test "measures ability to read, write, and use arithmetic; results are matched with criteria for intelligence rating."  THE FREE DICTIONARY, *http://medical-dictionary.thefreedictionary.com.*

[18] The GAF scale is used to rate an individual's "overall psychological functioning."  AMERICAN PSYCHIATRIC INSTITUTE, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV") 32 (4th ed. 1994).  The scale ascribes a numeric range from "1" ("persistent danger of severely hurting self or others") to "100" ("superior functioning") as a way of categorizing a patient's emotional status.  *See id.*  A GAF score in the "41 to 50" range indicates "serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR moderate difficulty in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)."  *Id.* at 34.

22

simple instructions," and "to make judgments on simple work-related decisions." (Tr. at 520). He stated that she was "moderately" limited in her ability to "understand and remember detailed instructions" and to "carry out detailed instructions." (*Id.*). He further reported that Pennington was "moderately" limited in her ability to "interact appropriately with the public," "with supervisor(s)," and "with co-workers"; to "respond appropriately to work pressures in a usual work setting"; and to "respond appropriately to changes in a routine work setting." (Tr. at 521). As a final matter, Dr. Lehman stated that Pennington would be able to manage benefit payments in her own interest. (*Id.*).

Two letters that are included in the administrative transcript, both dated January 6, 2005, are not medical records, but reports from Pennington's former employers on how her condition and abilities deteriorated over the course of her employment. (Tr. at 390, 391). One letter was written by Marilyn Ulmer ("Ulmer"), for whom Pennington worked at the Kingwood Medical Center from 1992 through 2002. (Tr. at 390). Ulmer stated that she was writing the letter because Pennington had "asked that [she] document her health issues as it [sic] impacted her work while working as a pharmacy technician." (*Id.*). Ulmer stated that, when Pennington began working for her, in 1992, she "was an outstanding technician," a "very hard worker" who would take extra shifts and do extra projects for her employer. (*Id.*). Ulmer indicated that Pennington's health problems began to impact her work in 2000 and 2001. (*Id.*). She recalled that, between 2000 and 2001, Pennington had a hysterectomy, developed severe back pain and leg pain, began to "itch[] severely," and suffered from the emotional pain of losing her husband. (*Id.*). Ulmer also reported that, by May 2001, Pennington was taking a variety of medications. (*Id.*). Apparently, Ulmer tried to accommodate Pennington by reducing her hours and by assigning to her tasks that required less time on her feet. (*Id.*). Ulmer stated that Pennington returned to full-time hours, sometime in 2002, and was promoted to "Technician Supervisor."

(*Id.*).   Ulmer resigned shortly after that to take a job with another company, Advocate Rx Solutions.   (*Id.*).   As a result, the only additional information provided is that, in August, 2003, Pennington attempted to work for her at Advocate Rx Solutions, but that she lasted only one day because she was "unable to tolerate the hours standing."   (*Id.*).

The other letter was written by Lisa Haile ("Haile"), one of the pharmacists who supervised Pennington at the Kingwood Medical Center.   (Tr. at 391).   Like Ulmer, Haile recalls that Pennington was "a very hard worker" who was "always 'going the extra mile.'"   (*Id.*).   Haile also remembered that, as Pennington's physical condition worsened, her "work abilities really slowed down."   (*Id.*).   Haile stated that she "truly believe[s] Sherry would much rather be working than be inflicted with this terrible condition."   (*Id.*).

### *Educational Background, Work History, and Present Age*

On the date of the second hearing, Pennington was 39 years of age.   (Tr. at 78).   She had a high school education, and had obtained a state certification to practice as a pharmacy technician.[19]   (Tr. at 50-51).   Her past relevant work was as a pharmacy technician.   (Tr. at 50-51, 80).

### *Subjective Complaints*

In her application for disability insurance benefits, Plaintiff claimed that she has been unable to work since November 17, 2002, because of fibromyalgia and chronic fatigue syndrome, and with symptoms such as chronic leg pain, debilitating headaches, allergies, fatigue, concentration problems, and insomnia.   (Tr. at 177).   She explained that, prior to that date, she tried to maintain employment by reducing the number of hours she worked, and by accepting responsibilities that would allow her to stay seated.   (*Id.*).   She stated, however, that

---

[19] Pennington's certification expired in 2006.   (Tr. at 515).

24

the pain and fatigue became so severe that she could no longer perform her job, and she had to stop working altogether.  (*Id*.).  She remarked that, "It is very frustrating knowing you can't do the work that you used to do."  (Tr. at 184).  As part of her application, Pennington also completed a Daily Activity Questionnaire, in which she claimed that "any physical activity tires [her] out" and increases her pain."  (Tr. at 198).  She stated that rest, a heating pad, or a hot bath gives her some relief from the pain.  (*Id*.).  In the questionnaire, Plaintiff also stated that, on an average day, "it takes most of the day just to do household chores [and] grocery shopping," because she "ha[s] to take lots of breaks."  (*Id*.).  She indicated, as well, that her physical problems did not limit her ability to care for her personal needs.  (Tr. at 199).  In a separate questionnaire, Pennington claimed that she did not suffer from mental or emotional problems.  (Tr. at 201-04).

Several months after filing her application, Plaintiff updated her claims, and she then specifically complained about "chronic fatigue, chronic leg pain, migraine headaches, [inability] to sleep, aching pain in feet, [and] fibromyalgia."  (Tr. at 211).  She claimed that her condition had worsened to the point that she sometimes "hurt[s] so bad [that she] can't get out of bed."  (*Id*.).  In addition, she referred to her doctor's finding that her "natural killer cells are very low," and claimed that this "causes a lot of the pain [and] other problems."  (Tr. at 214).  She further stated that she was currently being treated with medication for pain, a hiatal hernia, acid reflux, indigestion, sinus allergies, "itching" skin, and depression.  (Tr. at 216).

At the first hearing, Pennington testified that, in 2000, she sought medical help for leg and back pain.  (Tr. at 51).  She stated that she underwent several tests, and was eventually diagnosed as suffering from fibromyalgia and chronic fatigue syndrome.  (Tr. at 51-52).  Pennington described her symptoms, which continued to worsen, as follows:

> I had severe leg pain from the hips all the way down, lower back pain, headaches, nausea, fatigue.  I couldn't sleep at night and I was constantly tossing and turning

25

> because if I lay on one side it starts hurting so I have to lay on the other side or
> turning [sic] all during the night, just tired a lot, and that's about it.

(Tr. at 52).  She testified that these symptoms made it difficult, for instance, to "do the rounds"
at the hospital where she worked because her legs would hurt so badly.  (*Id.*).  She explained that
she used to be able to do her rounds in five to ten minutes, and that by the time she stopped
working, it was taking her forty-five minutes.  (*Id.*).  She also testified that she began to use a
cart for assistance when walking or standing.  (*Id.*).  Pennington testified that her employer tried
to accommodate her by giving her more computer work and paperwork, but that "even the sitting
down would hurt [her] legs," and she would not be able to sit for very long at any one time.  (Tr.
at 52-53).  She also testified that she began to have trouble concentrating and remembering
instructions, and that her employer expressed concern about her work performance as a result of
her memory problems.  (Tr. at 54).  Pennington testified that she began to miss a lot of work
because of her pain and symptoms, and because she had so many doctors appointments.  (Tr. at
53).  She stated that she was prescribed a variety of medications, but that they did not give her
much relief.  (Tr. at 51).  She told the ALJ that, in November, 2002, she felt that her job was in
jeopardy, and that she decided to take a leave of absence.  (Tr. at 53-54).  Pennington testified
that she attempted a return to work as a pharmacy technician in August, 2003, but that she barely
made it through one day at the new job because of her condition.[20]  (Tr. at 51).

Next, Pennington testified that, at the present time, she was experiencing pain "all over,"
with the worst pain in her lower back which ran from her hips to her legs.  (Tr. at 55).  She
testified that she has also suffered from right shoulder and arm pain since she broke her arm in
2002, and that it causes her difficulty lifting heavy items, reaching, typing, writing, and gripping
objects.  (Tr. at 55, 58).  She estimated that she could type on a keyboard or write for thirty

---

[20] At the second hearing, Pennington testified that she made three separate, unsuccessful attempts to return to work.
(Tr. at 97).

minutes before the pain would require her to stop.  (Tr. at 58).  She acknowledged, however, that she did not have any problems with her left arm.  (*Id*.).  Pennington described her pain as "[m]ostly constant," and said the "some days [the pain is] not as bad, but it's more bad than it is good."  (Tr. at 59).  Pennington testified further that she experiences headaches several times a week, and that they often require her to lie in a dark room for an hour, or even overnight.  (Tr. at 55, 59).  She also testified that she suffers from nausea on a daily basis, and that she does not know whether the nausea is the result of her medications, the "constant burning in her stomach," or any of her other ailments.  (Tr. at 55-56).  However, she testified that her nausea gets worse when she is more active, and that she takes medication for "[her] stomach," for acid reflux, and because of a hiatal hernia.  (Tr. at 56).  Pennington testified that she takes several other medications as well, including medications for pain, sinus problems, itching skin, and depression, as well as a medication which is meant to boost her immune system.  (*Id*.).  She stated that she experiences negative side effects from these medications, including fatigue, loss of concentration, and feeling as though she is "in a fog" or "a daze."  (Tr. at 56-57).  Pennington gave little testimony about depression, except to say that she "do[es] get a little depressed" because she can no longer do so many things that she used to do, and because "it always seems like [she is] in a daze."  (Tr. at 62).

At the second hearing, Pennington testified that she continued to experience the same symptoms she had described in the first hearing, and that she still had a similar medication regimen, with the addition of medication for muscle spasms.  (Tr. at 77-98).  She also testified that she has had several episodes, since 2000, "where [her] back goes out with no reasons and [she] can't move."  (Tr. at 83).  She stated that one such episode occurred in January, 2007, and that she was now being seen three times a week for back problems, and was receiving regular "like an electric shock treatment on [her] back."  (*Id*.).  She testified that, on the afternoon in

question, she found that she simply "couldn't get out of bed," and had to call the doctor to cancel her appointment.  (Tr. at 83-84).  She stated that she spent the next three weeks in bed.  (*Id*.). Pennington testified that, since that time, she has not "want[ed] to lift anything," even her five-month-old grandchild, and that walking, standing, and sitting quickly lead to severe pain from ranging from her back to her legs.  (Tr. at 84-85).  During the hearing, her attorney observed that she was rubbing her legs, and Pennington explained that she always rubs or "hits on" her legs in a vain attempt to reach the "deep down" pain.  (Tr. at 89).  Pennington testified that her headaches had worsened since the last hearing, and that they sometimes last for several days, and have become more resistant to treatment.  (Tr. at 92).  Pennington told ALJ Suttles that she had unintentionally lost 35 to 40 pounds in the past year, in part because "[her] stomach can't handle" much food intake.  (Tr. at 94-95).

Pennington testified that her history of depression began in 2001, following the death of her husband.  (Tr. at 82).  She testified that she is being treated for depression by her primary care physician, and that she is being prescribed anti-depressant medication.  (*Id*.).  Pennington attempted to describe her depression, in the following excerpt:

> When it comes to going out, I can't handle being around anybody or crowds.  I get just [sic] this, I don't know how to describe it, like a tightening in my chest and everything to where I just want to get away from everything.  And there's days that I go through to where I just start crying for no reason.  I don't know why.

(Tr. at 92).  She testified that those crying spells occur "[a]t least once or twice a week," and that she cannot determine any particular trigger for them.  (Tr. at 92-93).

Pennington testified that she had remarried since the last hearing, and that she lives with her husband, two of her children, two of his children, a two-year-old grandchild, and a five-month-old grandchild.  (*Id*.).  She stated that she also has another child and grandchild who do not live with her.  (*Id*.).  Pennington testified that her daughter, who lives with her, "does most of

the housework and stuff."  (Tr. at 85).  She also testified that this daughter cares for the

grandchildren during the day, and sends them to daycare while she works a late-evening shift at

a grocery store.  (Tr. at 85-86).  Pennington testified that she occasionally drives, and stated that

she cooks her family's meals, although it is unclear whether she meant that she does so regularly

or only on occasion.  (Tr. at 87, 95).  Plaintiff testified that she does little else besides stay at

home, usually inside the house and in a reclined position, watching television and occasionally

using the computer.  (Tr. at 86, 88, 95).

### Lay Witness Testimony

At the first hearing, Pennington's mother, Sarah Buerger, offered testimony as a lay

witness regarding her daughter's condition.  (Tr. at 62-64).  Buerger testified that she has

observed Pennington "beat[ing] on her legs because they hurt so bad."  (Tr. at 63).  She also

testified that she "know[s] that [Pennington] goes through depression because of what she can't

do anymore."  (*Id.*).  She further testified that her daughter has difficulty concentrating because

of her pain.  (Tr. at 63-64).  Buerger testified that Pennington has more "bad days" than "good

days," and that, on a "bad day," she cannot function at all.  (Tr. at 63).

### Expert Testimony

At the 2005 hearing, the ALJ heard testimony from Dr. John Anigbogu, a physician who

specializes in "physical medicine and rehabilitation."  (Tr. at 64-71).  Based on the medical

records on file, Dr. Anigbogu testified that Pennington has several medical problems, "the main

one[s] being a chronic fatigue syndrome and fibromyalgia."  (Tr. at 64).  He testified that she

also suffers from GERD, a hiatal hernia, lower back and joint pain, chronic urticaria, "a non-

specific immune problem," and depression.  (Tr. at 64-65).  He testified that he compared

Pennington's symptoms to the appropriate Listings, and determined that her condition does not

meet or equal any Listing.  (Tr. at 65).  He made clear that he was taking into account her

purported history of depression, but that the medical evidence of depression was too scarce to warrant a consideration of the Listing specific to mental impairments. (*Id.*). Dr. Anigbogu also testified that, given her physical and mental condition and the side effects of her medication, Pennington would not be able to perform work that requires more than a light level of exertion. (Tr. at 65-66). Dr. Anigbogu commented that the difficulty with evaluating chronic fatigue syndrome or fibromyalgia is that there is no reliable, objective test for either condition, so that medical professionals have to rely largely on the patient's subjective reports of symptoms. (Tr. at 66-71).

At the second hearing, the ALJ heard testimony from Charles Poor, a vocational expert. (Tr. at 98-107). Poor characterized Pennington's past work as a pharmacy technician as skilled or semi-skilled work that requires a light level of exertion. (Tr. at 98). The ALJ then posed a hypothetical question to the expert, as shown in the following exchange:

Q        . . . Okay, sir, please assume a younger individual, 12th-grade education, exertional ability to occasionally lift 20 pounds, 10 pounds frequently with a sit/stand option and walking ability of four of eight hours. Limited climbing stairs, ladders, ropes, scaffolds. No running. Push/pull and gross fine is unlimited. Gets along with others. Understands detailed instructions. Concentrates, performs detailed tasks and responds and adapts to workplace changes and supervision. Based on that, can you make an assessment as to the ability to do past work?

A        I don't think a person with that profile could do the past relevant work.

Q        Any transferable skills?

A        Well, certainly, the work of pharmacy technician has encompassed skills such as interacting with the public, being able to work within precise guidelines and follow safety measures, work in a, work in a retail environment. So I think there are skills that would transfer to other jobs, yes.

Q        Okay. Can you list three of those other jobs that they'd be transferable to?

A        Well this wouldn't be an exhaustive listing, but jobs that would be consistent with your hypothetical would include job titles such as a receptionist, an answering service worker.

Q      Now these are light jobs, right?

A      Yes.

(Tr. at 98-99).  Poor testified that such jobs are available in significant numbers in the local and

national economy.  (Tr. at 100).

Next, the ALJ posed another hypothetical question, as follows:

Q      Using the same exertional limitations and elements of hypothetical 1, but
with the ability to understand simple instructions, concentrate and perform simple
tasks, and with limited employee/public contact.  What types of jobs would be
available at that level?  First, let me ask you this.  Would there be any transferable
skills at that level?

A      No.  I think most of the transferable skills would be similar to the jobs that
I've mentioned involving public contact, following set guidelines, keeping
records, that sort of thing.  I think we would have to go to unskilled work.

Q      With that hypothetical?

A      Yeah, with the second one going to unskilled work.

Q      Okay.  Well what kinds of light, unskilled work can she do at that level?

A      Specific job titles would be a laundry worker, a kitchen helper and a bench
assembler.

(Tr. at 100-01).  Poor testified that there are also a significant number of these types of jobs

available in the national economy.  (Tr. at 101).

The ALJ then posed a third hypothetical question to the vocational expert:

Q      Okay.  Hypothetical 3, an exertional ability to occasionally lift ten pounds
and five pounds frequently, with the ability to understand simple instructions,
concentrate and perform simple tasks.  And using the, again [sic] with the limited
employee/public contact, and using the other elements of the previous
hypothetical in 1, . . .
                              *    *    *
The exertional, the exertional limitations are, are different and then I've also
added the, . . . the simple ability to understand instructions, simple instructions
and concentrate and perform simple tasks, but the other things remain.  And . . .
there's limited employee/public contact, but the other elements remain the same.

A      Well, I think, I think you'd have to -- the job title of bench assembler
would still be in, in play.

31

Q      And these are sedentary, unskilled positions --

A      That's right.

*      *      *

But then a new job title would be that of optical goods worker and surveillance monitor.

Q      All right.

(Tr. at 101-02).  Poor testified that these positions are available in significant numbers, as well.

(Tr. at 102).

Following the third hypothetical question, Plaintiff's attorney, Marc Whitehead, was given the opportunity to question the vocational expert witness.  (Tr. at 103).  First, Whitehead referred Poor to Dr. Lehman's evaluation, and posed the following questions:

Q      Okay.  Oh, given that medical source statement there, what do you see there that is vocationally significant?

A      Well the scale is a five-point scale going from none to extreme, and it looks like out of the ten criteria that are evaluated, seven are rated as moderate and three are listed as slight.  Slight is defined as, there are some mild limitations in this area, but the individual can generally function well, and moderate is defined as, there is moderate limitation in this area, but the individual is still able to function satisfactorily.

So from a vocational standpoint, I don't think this evaluation profile would, would eliminate any of the jobs that I've mentioned using the definitions that are on this form.

(Tr. at 103-04).  Referring Poor to another part of Dr. Lehman's report, Whitehead continued this line of questioning, as follows:

Q      Okay.  That report would seem to indicate that this individual has a problem functioning at a satisfactory pace and I'm going to . . . assume that what that means is that somebody would be slowed from a normal pace of work production, say up to a third of normal work production.  How would that affect somebody vocationally?  Let's assume that they're limited to no better than sedentary or light --

A      Right.

32

Q         -- otherwise.

A         I think a person with this profile would have significant vocational
limitations in terms of any kind of job that had a production factor related to it.

Q         Okay.  Would that eliminate all job possibilities?

A         Well, not necessarily.  For example, a job like a, like a receptionist, there
the, the emphasis is not on working quickly or the speed or the production is, is
virtually non-existent.  Certainly jobs like bench assembler and, and jobs like that,
where there is typically a production quota or some expectation that you would
work at a certain pace, so it would kind of depend on the job.  But this is, what
you've shown me here, certainly suggests significant limitations, at least on the
standardized test.  This is, this is part of a neuropsych screening evaluation.  I'm
familiar with this particular instrument, but . . . [there] is certainly reduced
performance.

Q         And just so we can put it in vocational terms, what restriction would we
have here?  Will you say this person would not be able to work in a job that
requires a production pace?

A         Yes.

(Tr. at 104-05).

The remainder of Whitehead's questions to Poor were based on Dr. Salvato's RFC

evaluation.  (Tr. at 105-07).  Whitehead asked whether an individual who would "miss[] more

than four days a month because of illness or injury on a regular basis" would be "employable at

any level."  (Tr. at 106).  Poor replied, "In my opinion, no sir."  (*Id*.).  This line of questioning

continued in the following manner:

Q         . . . assume that an individual could lift less than ten pounds occasionally
and rarely lift ten pounds.  Would that person fit any vocational profile[?]

                              *    *    *
A         . . .  Oh yeah.  There's a large number of jobs that, that don't require
lifting, but you, you don't say what the lower limit is, but there are . . . a large
number of what are called clerical and sale lot, clerical and sales occupations that
don't exceed lifting five pounds.

Q         Okay.  And if we add the additional restriction . . . that this person is, is
capable of sitting or standing or walking less than two hours in an eight-hour day?

33

> A       Sitting, standing, walking less than two hours?  That's not a description of
> a competitive worker.

(*Id*.).  As his final question, Plaintiff's counsel asked Poor whether he saw anything else in Dr.

Salvato's evaluation of Pennington's residual functional capacity that would be "vocationally

limiting."  (Tr. at 107).  Poor replied,

> Well the examiner says that stress precipitates pain.  That could be
> vocationally significant.  Well you've already asked me about [a part of the RFC
> assessment], which assumes that capacity to sit and stand and walk, a total of less
> than two hours out of an eight-hour workday, so that would seem to imply that
> they would have to be horizontal six out of eight hours.  That's certainly not a
> description of a competitive worker.
> And the examiner in [the RFC assessment] opines that the claimant would
> have to take unscheduled breaks and they would have to take such unscheduled
> breaks after every one hour of activity and they would have to rest for two hours
> before returning to work and during such breaks they would need to lie down.
> Those are certainly negative vocational factors.
> And as [h]as already been pointed out, they opine that the person would
> miss more than four days of work [per month].  So taken en toto, . . . the person
> described in this profile could not do any competitive work.

(*Id*.).

### *The ALJ's Decision*

Following the hearing on remand, ALJ Suttles made written findings on the evidence.

(Tr. at 24-31).  From his review of the record, he determined that Pennington suffers from

fibromyalgia, chronic fatigue syndrome, and "affective mood disorder (depression)."  (Tr. at 26).

He also found that those impairments are "severe."   (*Id*.).   However, he determined that

Pennington "does not have an impairment or combination of impairments that meets or

medically equals one of the listed impairments."  (Tr. at 27).  Next, the ALJ found that

Pennington is unable to perform her past work as a pharmacist technician, because she can no

longer perform at the light level of exertion required for that position.  (Tr. at 30).  However, he

determined  that she has the residual functional capacity  to perform sedentary work, with certain

34

restrictions, as follows:

> [T]he claimant has the residual functional capacity to lift and/or carry 10 pounds occasionally and 5 pounds frequently.  She requires a sit/stand option and can walk four hours in an eight hour day.  [She] is limited from climbing stairs, ladders, ropes, [or] scaffolds, [and from] running.  Her push/pull and gross/fine ability is unlimited.  She gets along with others, understands simple instructions, concentrates and perform[s] simple tasks, and responds and adapts to workplace changes and supervision with limited contact with coworkers and the public.

(Tr. at 28).  The ALJ found that there "are jobs that exist in significant numbers in the national economy that Pennington could perform," including work as a "bench assembler," an "optical goods worker," and a "surveillance monitor."  (Tr. at 30-31).  The ALJ ultimately concluded that Pennington does not qualify as a "disabled" individual, as required for an award of benefits.  (Tr. at 31).  With that decision, he denied Pennington's application for disability insurance benefits. (*Id*.).  That denial prompted Plaintiff's request for judicial review.

It is well settled that judicial review of the Commissioner's decision is limited to a determination of whether it is supported by substantial evidence, and whether the ALJ applied the proper legal standards in making it.  *See Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452 (citing *Brown*, 192 F.3d at 496).  Any conflict in the evidence is to be resolved by the ALJ, and not the court.  *See id*.  A finding of "no substantial evidence" is proper only if there are no credible medical findings or evidentiary choices that support the ALJ's decision.  *See Johnson*, 864 F.2d at 343-44 (quoting *Hames*, 707 F.2d at 164).

Plaintiff complains that "[t]he ALJ improperly determined [her] residual functional capacity."  (Plaintiff's Motion at 4-10).  She also contends that the ALJ improperly rejected the opinions from her treating physicians, and, particularly, those from Dr. Salvato, who has treated her for fibromyalgia, chronic fatigue syndrome, and depression for several years.  (*Id*.; Plaintiff's Reply at 4-6).  In fact, many of Dr. Salvato's findings are in direct opposition to the ALJ's RFC determination.  For instance, while the ALJ held that Pennington could lift or carry 10 pounds

occasionally and 5 pounds frequently, Dr. Salvato found that she could lift or carry 10 pounds rarely, and less than 10 pounds occasionally.  (Tr. at 28, 510).  In addition, the ALJ found that Pennington "requires a sit/stand option and can walk four hours in an eight hour day," but Dr. Salvato found that she could only sit, stand, or walk less than two hours in an eight-hour workday.  (Tr. at 28, 509-10).  Further, the ALJ stated that Pennington's "gross/fine ability is unlimited," while Dr. Salvato specifically found that she has "significant limitations in doing repetitive reaching, handling or fingering."  (Tr. at 28, 512).  Moreover, the ALJ concluded that Pennington "understands simple instructions, concentrates and perform[s] simple tasks, and responds and adapts to workplace changes and supervision," while Dr. Salvato repeatedly diagnosed her as suffering from disturbances in concentration and memory and found her to be unable to tolerate even low levels of workplace stress.  (Tr. at 28; *see, e.g.*, Tr. at 335, 339, 343, 347, 351, 357, 508-09).  Significantly, in its decision to remand the case, the Appeals Council explicitly pointed to these and other findings by Plaintiff's treating sources, and ordered the ALJ on remand to give further consideration to these sources and explain the weight given to their opinions.  (Tr. at 33-34).

In his written decision, ALJ Suttles addressed Dr. Salvato's RFC assessment, but assigned it "little weight" because it was "inconsistent with the claimant's statements about her actual daily activities" and "the findings of the consultative physician."  (Tr. at 30).  The law is clear that an ALJ cannot reject a treating source's opinion without identifying specific, legitimate reasons to do so.  *See Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir. 2000); *Newton*, 209 F.3d at 453.  In fact, the Fifth Circuit has repeatedly stated that, as a rule, "the opinions, diagnoses and medical evidence of a treating physician who is familiar with the claimant's injuries, treatment, and responses should be accorded considerable weight in determining disability."  *Loza*, 219 F.3d at 395; *see Myers*, 238 F.3d at 621; *Greenspan*, 38 F.3d at 237.

36

However, it is also true that "although the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician, the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987) (quoting *Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981)).  And it is equally settled that an ALJ must evaluate every medical opinion that is received on a claimant's behalf, and that he cannot reject the opinion of a treating physician without "good cause" to do so.  *See* 20 C.F.R. § 404.1527(d); *Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Newton*, 209 F.3d at 455-56; *Greenspan*, 38 F.3d at 237.  "Good cause" may exist when the treating physician's statements are "brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence." *Myers*, 238 F.3d at 62l; *see Greenspan*, 38 F.3d at 237; *see also Newton*, 209 F.3d at 456.  But Fifth Circuit precedent is clear that:

> A finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  *Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927.*  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted even if it does not meet the test for controlling weight.

*Id.* (quoting SSR 96-2p).  For that reason, a claimant is entitled to a remand if the ALJ rejects, or gives little weight to, a treating doctor's opinion without considering each of the factors set out in the Social Security regulations.[21]  *See Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 456.

---

[21] Those factors are as follows:
  (1) the physician's length of treatment of the claimant;
  (2) the physician's frequency of examination;
  (3) the nature and extent of the treatment relationship;
  (4) the support of the physician's opinion afforded by the medical evidence of record;
  (5) the consistency of opinion with the record as a whole; and
  (6) the specialization of the treating physician.

In this case, the ALJ's first rationale for giving little weight to Dr. Salvato's RFC assessment was the following:

> Dr. Salvato['s] assessment is inconsistent with the claimant's statements about her actual daily activities during the period in question, which include taking care of her grandchildren, watching television and using her computer for research purposes, and cooking for her family.

(Tr. at 30). However, his depiction of Plaintiff's testimony is inaccurate. For instance, at the hearing, Pennington testified that her daughter took care of the grandchildren at home, and took them to day care when she had to work. (Tr. at 85-86). In fact, she testified that her family no longer leaves her alone with the grandchildren, and that she does not feel that she is even capable of lifting and holding the five-month-old baby. (Tr. at 84-85). As to activities involving the television and computer, Pennington merely testified that she spends most of her days reclining and watching television, and that she uses the computer only occasionally, as it quickly becomes very painful to use the keyboard. (Tr. at 58, 86, 88, 95). And while Pennington did make a reference to cooking meals for her family, she also stated that she does not do "a whole lot" of cooking, and explained that, when she does cook, it usually involves "TV dinners [that you] stick in the oven." (Tr. at 60). Given Pennington's actual testimony, then, the first part of the ALJ's rationale has little merit. The ALJ also dismissed Dr. Salvato's RFC assessment as "inconsistent with the findings of the consultative physician."[22] (Tr. at 30). It is true that Dr. Lopez and Dr. Blacklock, the two state consultative physicians who evaluated Pennington's physical condition, found Plaintiff to be in relatively good health. (*See* Tr. at 317-22, 324-31). However, it is not

---

*Newton*, 209 F.3d at 456; *see* 20 C.F.R. § 404.1527(d)(2)-(6); *Myers*, 238 F.3d at 621.

[22] In this portion of his findings, the ALJ does not identify which consulting physician he is referring to, nor does he provide any details as to which findings are "inconsistent." (*See* Tr. at 30). The court can only surmise his meaning, based on other portions of his decision and on the medical records. For this reason, alone, it is clear that the ALJ fell short of his duties in handling the opinions of a treating source. *See Loza*, 219 F.3d at 395; *Newton*, 209 F.3d at 453.

38

clear why the ALJ would determine that the consultants' opinions rebut Dr. Salvato's findings,

particularly as each consultant saw her on only one occasion, and those appointments took place

nearly two years before Dr. Salvato's RFC assessment.  In regard to her mental impairments, Dr.

Lehman, the psychological consultant, found that Pennington had an average, albeit low, level of

intelligence.  (Tr. at 515-16).  He also found her to be only "slightly" to "moderately" limited in

her ability to understand and carry out instructions, make judgments, interact with others, and

handle workplace pressure.  (Tr. at 520-21).  Despite those findings, however, Dr. Lehman rated

Pennington's GAF as a "48."  (*See id.*).  A GAF score of 48 suggests that Pennington may suffer

from "serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent

shoplifting)," or from "moderate difficulty in social, occupational, or school functioning (*e.g.*, no

friends, unable to keep a job)."  *See* DSM-IV at 34.  Clearly, a GAF score of 48 is not

inconsistent with Dr. Salvato's opinion that Pennington's level of functioning is significantly

impaired.  *See id.*  Yet the ALJ did not address it.  Nor did the ALJ address the earlier findings

by Dr. Salvato, or consider the opinions from Pennington's other treating sources, even though a

lot of this evidence supports Dr. Salvato's RFC assessment, and contradicts some of the

consultants' findings.  (*See, e.g.*, Tr. at 265, 276-85, 353-54, 470-95, 515).  Significantly, the

ALJ did not address the ample evidence regarding the negative side effects of Plaintiff's

medications, although it is well settled that an ALJ should consider any side effects that "could

render a claimant disabled or at least contribute to a disability."  *Loza*, 219 F.3d at 397; *see*

*Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999); *Bowling v. Shalala*, 36 F.3d 431, 438 (5th

Cir. 1994).  The ALJ's errors were clearly prejudicial, because had he properly considered the

evidence, he might have reached a different result.  *See Newton*, 209 F.3d at 453; *Ripley*, 67 F.

3d at 557 n.22.  In this case, remand is appropriate so that the ALJ can properly consider all of

the evidence of record before reaching a decision on whether Pennington is disabled.  *See Myers*,

238 F.3d at 621; *Loza*, 219 F.3d at 395; *Newton*, 209 F.3d at 453-58.

It is worth noting, as well, the elusive natures of both fibromyalgia and of chronic fatigue

syndrome.  *See Benecke v. Barnhart*, 379 F.3d 587, 589-90 (9th Cir. 2004).  At the first hearing,

Dr. Anigbogu, the medical expert, stated that the difficulty with evaluating either syndrome is

that there is no reliable, objective test for either condition, so that medical professionals are

forced to rely largely on the patient's subjective reports of her symptoms.  (Tr. at 66-71).  It has,

in fact, been recognized that the cause of fibromyalgia,

> is unknown, there is no cure, and it is poorly-understood within much of the
> medical community.  The disease is diagnosed entirely on the basis of patients'
> reports of pain and other symptoms.  The American College of Rheumatology
> issued a set of agreed-upon diagnostic criteria in 1990, but to date there are no
> laboratory tests to confirm the diagnosis.

*Benecke*, 379 F.3d at 590 (citing *Jordan v. Northrop Grumman Corp.*, 370 F.3d 869, 872 (9th

Cir. 2004); *Brosnahan v. Barnhart*, 336 F.3d 671, 672 n.1 (8th Cir. 2003)).  Common symptoms

of fibromyalgia, such as "chronic pain throughout the body, multiple tender points, fatigue, [and]

stiffness" are largely subjective matters.  *See id.* at 589-90 (citing *Brosnahan*, 336 F.3d at 672

n.1).  The court in *Benecke* found that the "ALJ erred by 'effectively requir[ing] "objective"

evidence for a disease that eludes such measurement.'"  *Id.* at 594 (quoting *Green-Younger v.*

*Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003)).  In this case, there is no dispute that Pennington

suffers from fibromyalgia, and that she has been treated for the condition, on a regular basis, for

years.  (*See, e.g.*, Tr. at 26-27, 51-52, 64-71, 253-64, 333-89, 506-12).  The record is also replete

with Plaintiff's subjective complaints of pain, and of the limitations that she ascribes to her

condition.  (*See, e.g.*, Tr. at 51-58, 77-98, 177, 184, 198-204, 211-16).  In his decision, however,

the ALJ simply found that this evidence was not supported by objective, medical findings.  (Tr.

at 26-30).   Further, the ALJ did not consult an expert on fibromyalgia, which the relevant regulations clearly permit him to do.  *See* 20 C.F.R. § 404.919(a); *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977) (quoting *McGee v. Weinberger*, 518 F.2d 330, 332 (5th Cir. 1975)).  Or, given the elusive nature of fibromyalgia, the ALJ could ask a witness with expertise in such conditions to testify at a new administrative hearing.  *See Richardson v. Perales*, 402 U.S. 389, 400 (1971).  On remand, the ALJ should give due consideration to the evidence, including the subjective evidence, on fibromyalgia and chronic fatigue syndrome, and consult with appropriate experts, before he can make a decision that is truly supported by substantial evidence.  *See Ripley*, 67 F.3d at 555; *Wren*, 925 F.2d at 126; *Johnson*, 864 F.2d at 343.

As a final matter, Plaintiff argues that, because there is evidence that she has "good days" and "bad days," the ALJ had a responsibility to consider whether she would be able to maintain employment.   (Plaintiff's Motion at 8).   The Fifth Circuit has made clear that an ALJ is not required in every case to make a separate finding that a social security claimant who is capable of performing a job, will also be able to maintain that job.  *See Perez v. Barnhart*, 415 F.3d 457, 465 (5th Cir. 2005); *Frank v. Barnhart*, 326 F.3d 618, 619 (5th Cir. 2003).  However, the Fifth Circuit noted that "[n]evertheless, an occasion may arise . . . where the medical impairment, and the symptoms thereof, is of such a nature that separate consideration of whether the claimant is capable of maintaining employment is required."  *Id*. (citing *Watson v. Barnhart*, 288 F.3d 212, 217-18 (5th Cir. 2002)).  Such a circumstance arises when, "by its nature, the claimant's physical ailment waxes and wanes in its manifestation of disabling symptoms."required."[23]   *Id*.  In this case, there is evidence that Plaintiff's condition "waxes and wanes."  (*See* Tr. at 59 [Pennington],

---

[23] The *Frank* court stated, "For example, if Frank had alleged that her degenerative disc disease prevented her from maintaining employment because every number of weeks she lost movement in her legs, this would be relevant to the disability determination."  326 F.3d at 619.

63 [Buerger], 512 [Dr. Salvato], 515 [Dr. Lehman]).   Dr. Salvato stated that Pennington's

impairments are likely to produce "good days" and "bad days."  (Tr. at 512).  Also, Dr. Lehman

noted that "Pennington's ability to complete routine tasks varies dramatically depending on

whether she's having a 'good day' or 'bad day.'"  (Tr. at 515).  He elaborated, as follows:

> On "bad days," she does not get out of bed except to use the restroom and eat.  On
> a "good day," she performs simple, routine chores including laundry, washing
> dishes and simple cooking.  She stated that she shops and leaves the house "only
> when [she has] to."  She tries to interact with her grandchildren, providing that
> lifting is not involved.  On a "good day," she is able to bathe and dress herself
> without assistance.

(Tr. at 515).  In light of this evidence and of the nature of fibromyalgia and chronic fatigue

syndrome, the ALJ should address, on remand, whether Pennington would be able to maintain a

job, should she be capable of securing one.  *See Perez*, 415 F.3d at 465; *Frank*, 326 F.3d at 619;

*Watson*, 288 F.3d at 217-18.

As the Fifth Circuit has explained, "where the rights of individuals are affected, an

agency must follow its own procedures, even where the internal procedures are more rigorous

than otherwise would be required."  *Newton*, 209 F.3d at 459 (quoting *Hall*, 660 F.2d at 119).  If

an agency fails to follow those procedures, and "[i]f prejudice results from the violation," then

"the result cannot stand."  *Id*.  In social security cases, a claimant establishes prejudice by

showing that, absent the errors, the ALJ might have reached a different conclusion.  *See id*.  In

this case, Pennington was prejudiced, because if the ALJ had followed procedure—including

properly treating the opinions of her treating physicians, addressing her GAF score, and

considering her ability to maintain employment—he might have reached a different result.  *See*

*id*.  Because the ALJ failed to follow SSA procedures, his decision is not supported by

substantial evidence, and is subject to reversal.  *See id*. at 452; *Ripley*, 67 F.3d at 557 & n.22.

For these reasons, this matter should be remanded, under sentence four of 42 U.S.C. 409(g), on the issue of Pennington's physical and mental impairments.

**Conclusion**

Accordingly, it is **RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **GRANTED**, and that Defendant's Motion for Summary Judgment be **DENIED**.

It is also **RECOMMENDED** that this case be **REMANDED** for further development on the issue of Plaintiff's physical and mental impairments, as set out in this memorandum.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have fourteen days to file written objections, pursuant to 28 U.S.C. § 636(b)(1) (effective Dec. 1, 2009).  Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the chambers of Judge Lee H. Rosenthal, Room 11535, and to the chambers of the undersigned, Room 7007.

**SIGNED** at Houston, Texas, this 9th day of February, 2010.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**

43